386 A.2d 520

COMMONWEALTH of Pennsylvania

v.

Louis R. RIGGINS, Appellant (two cases).

Supreme Court of Pennsylvania.

Argued Oct. 14, 1976.

Decided April 28, 1978.

Joel Harvey Slomsky, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

NIX, Justice.

The appellant, Louis Riggins, was convicted by a jury of murder of the first degree and criminal conspiracy in connection with the stabbing death of Linda DeBose in Philadelphia on February 13, 1974. Post-verdict motions were denied. A sentence of life imprisonment was imposed for murder, and a consecutive sentence of five to ten years was imposed for criminal conspiracy. The judgment of sentence for murder was appealed to this Court, and the judgment of sentence for criminal conspiracy was appealed to the Superior Court, which certified the appeal to this Court. We affirm.

■ Appellant first challenges the sufficiency of the evidence to sustain the verdict. Our well established test for sufficiency of evidence is whether accepting as true all the evidence together with all reasonable inferences therefrom upon which the jury could properly have based its verdict, such evidence and inferences are sufficient in law to prove guilt beyond a reasonable doubt. *Commonwealth v. Ilgenfritz*, 466 Pa. 345, 348, 353 A.2d 387, 389 (1976). In addition, we are to consider the evidence in the light most favorable to the Commonwealth as verdict winner. *Id.* So viewing the evidence, we find it sufficient.

The Commonwealth's trial evidence was as follows: The victim's mother, accompanied by a co-worker, Mrs. Young, stopped by the home of her two daughters late at night to see that all was well. She discovered a large cooking knife and bloody paper towels on the kitchen countertop, and at the same time heard the victim calling faintly from the basement. Upon going down to the basement, the mother found the victim lying in a pool of blood with numerous stab wounds to her right arm, chest and throat. In answer to her mother's question as to what caused her injuries, the victim clearly and repeatedly named the appellant and two of appellant's regular companions. The mother's co-worker came down the stairs and heard the same three people named as the assailants.

The mother called the police and an emergency patrol wagon arrived within minutes. The senior police officer found the victim in a severely wounded state and heard her say repeatedly that she was dying. When questioned, she replied, "They stabbed me." She also stated there had been three assailants. The police officer then grabbed the nearest available thing to write on, a napkin. The victim gave him the same three names she had given her mother, and told the officer they were all Muslims who lived in Frankford and belonged to the Susquehanna Mosque. The officer wrote this information in abbreviated form on the napkin. After taking the victim to the hospital, the officer showed the names on the napkin to another policeman. Seeing appellant's name, the other officer said he knew where appellant lived. When the police went to the address supplied by the officer, they were given another address by appellant's parents. Arriving at that destination, they apprehended appellant as he ran to get into a car.

The victim's sister, Rose DeBose, testified at trial that earlier during the evening in question she answered the telephone at the home where she and her sister, the deceased, resided. The caller identified himself as "Louis" and asked for Linda DeBose, the victim. The witness further testified that she recognized the voice as that of Louis Riggins, whom she knew from having spoken to him before, both in person and by telephone. At the end of the telephone conversation, Linda DeBose, the victim, told Rose DeBose, "Louis will be over later on." When the sister left the house at 9:30 p. m. she locked the door. The door had two locks and a peephole. She testified that they always kept the door locked and admitted no one unless identified. She returned to the house at 11:45 p. m., after the police had taken the victim to the hospital. There was no sign of forcible entry. Rose DeBose further testified that three nights before the stabbing she observed Linda in their home along with appellant and one of the other named assailants. The other individual and Linda were engaged in an angry argument.

■ The first contention relates to the dying declarations made by the victim. Appellant concedes that these declarations were clearly admissible as an exception to the hearsay rule. He argues, however, that the dying declarations were the only testimony identifying him as the perpetrator of the act and that these declarations constitute insufficient evidence as a matter of law unless corroborated by other evidence linking him directly to the crimes. The requirement of corroboration for dying declarations is not in accordance with the law of this jurisdiction. The credibility, interpretation and weight to be given a dying declaration under the attendant facts and circumstances of the case, are matters exclusively for the jury. *Commonwealth v. Brown*, 388 Pa. 613, 131 A.2d 367 (1957); *accord*, 5 Wigmore, Evidence § 1451(b) (Chadbourn rev. 1974). The solemnity of an occasion in which the declarant is conscious of the imminence of death justifies giving the dying declaration the same weight as sworn testimony. The reliability accorded a sworn statement springs from the declarant's appreciation of the significance of the oath. In the case of the dying declaration the awareness of impending death provides the assurance of the truthfulness of the utterance. *Accord*, McCormick on Evidence § 286 (2nd ed. 1972).

"Some authorities which limit the value and weight to be given to dying declarations, point out that the declarant may be influenced by hatred or revenge or similar unworthy motives, but this is equally applicable to any despicable character who takes the witness stand. ' "When every hope of this world is gone, when every motive to falsehood is silenced, and the mind is induced by the most powerful considerations to speak the truth, a situation so solemn and awful is considered by the law as creating the most impressive of sanctions." 1 Wharton's Criminal Law, § 669; 3 Russell by Greaves 250; 1 Greenleaf, §§ 156, 162, 346; 1 Taylor on Evidence 616.': *Brown v. Commonwealth*, 73 Pa. 321, page 327.

Expressed in other words, when a person is faced with death which he knows is impending and he is about to see

his Maker face to face, is he not more likely to tell the truth than is a witness in Court who knows that if he lies he will have a locus penitentiae, an opportunity to repent, confess and be absolved of his sin? For all these reasons, we believe, weighing all the pros and cons, that it is in the best interests of the public that a dying declaration should be considered as the equivalent of testimony given under oath in open Court."

*Commonwealth v. Brown, supra,* 388 Pa. at 617--18, 131 A.2d at 369–70 (footnote omitted).

While we concede that one consciously approaching death may still deliberately distort truth, we are also aware that the oath has, in many instances, failed to deter falsehood. Nor can it be said with any assurance, that where a witness is under oath the falsehood will necessarily be detected through cross-examination. There is no infallible method yet devised that will guarantee only truthful statements and we are forced to rely upon those circumstances that human experience demonstrates tend to encourage truthful responses and to discourage false utterances.

On several occasions within the last few years, this Court has rejected contentions that would undermine the validity of the dying declaration exception to the hearsay rule. In *Commonwealth v. Smith,* 454 Pa. 515, 314 A.2d 224 (1973), we stated:

"Appellant first objects to the admission of the deceased's tentative identification under the dying declaration exception to the hearsay rule. The reliability of a dying declaration is provided not by an oath, nor by cross-examination; rather, its admissibility is based on the premise that no one 'who is immediately going into the presence of his Maker will do so with a lie upon his lips.' Lush, L. J., *Regina v. Osman,* 15 Cox C.C. 1, 3 (Eng.1881)."

*Id.* 454 Pa. at 517--18, 314 A.2d at 225.

Again, in *Commonwealth v. Douglas,* 461 Pa. 749, 337 A.2d 860 (1975), we observed:

"Preliminarily, appellant argues that the concept of a dying declaration is predicated upon a vestige of the past

and is without meaning in our modern society. He would have us conclude that the sophistication of mankind today is such that the knowledge of impending death no longer engenders apprehension of the unknown and fails to deter falsehood and is incapable of inspiring truth. With this novel proposition we cannot agree. While many things have changed in our country  .   .   .   one constant force has been man's awe and apprehension of death."

*Id.* 461 Pa. at 757–58, 337 A.2d at 864.

To accept appellant's present contention that where the link establishing the identity of the perpetrator of the crime is supplied by an uncorroborated dying declaration the evidence must be deemed insufficient as a matter of law, requires a determination that dying declarations must be accorded less weight than other types of admissible evidence. This we decline to do. The jury was properly instructed that they could consider these statements of the deceased in determining whether the appellant was one of the killers. This evidence alone, if believed (and it apparently was believed by the jury) was sufficient in law to sustain the verdict.[1]

Appellant further contends the court erred in denying his two motions for mistrial based on two witnesses' statements, from which appellant claims the jury might have inferred prior criminal activity on his part. The first motion was based on the testimony of the officer who arrested appellant, Detective Thompson, who gave the following account when asked by the prosecuting attorney what happened after he and another officer, Lieutenant Martin, went to the hospital where the victim was being treated shortly after the stabbing:

"A. [by Detective Thompson] Well, we talked to the doctor and nurses that were working on Miss DeBose, and we saw her mother and father in the accident ward. We could not talk to Mrs. DeBose. There were some uni-

---

1. In view of our disposition of this issue we need not discuss the Commonwealth alternative argument that there was in fact corroboration of the dying declarations.

formed officers there, and he explained to us what had happened and what he did at the house, and he brought out a yellow piece of paper with some names on it, and he read these names off, and one of the names I recognized and I told Lt. Martin. I said, 'Since we can't talk to her now, we might as well go and try to get him. I know where he lives at.'

Q. [by prosecuting attorney] Which of those names are you referring to?

A. [by Detective Thompson] Louis Riggins."

In response to defense counsel's objection, the court sustained the objection and struck the reference to Louis Riggins, but refused to declare a mistrial. Appellant argues that Detective Thompson's testimony that he had stated he knew where appellant lived might reasonably have created an inference in the minds of the jury that appellant must have been engaged in prior criminal activity,[2] and that the possibility of such an inference was so prejudicial as to require the declaring of a mistrial. We disagree. As we stated in *Commonwealth v. Banks*, 454 Pa. 401, 411, 311 A.2d 576, 581 (1973), "To warrant a characterization as prejudicial the testimony must convey to the jury, either expressly or by reasonable implication, the fact of a prior criminal offense."

The detective's passing inference in this case to the fact that he knew where appellant lived cannot reasonably be said to have given the jury the impression that appellant

2. In *Commonwealth v. Allen*, 448 Pa. 177, 181–82, 292 A.2d 373, 375 (1972), this Court stated: "It is a fundamental precept of the common law that the prosecution may not introduce evidence of the defendant's prior criminal conduct as substantive evidence of his guilt of the present charge. It has been succinctly stated that '[t]he purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes he was more likely to commit that crime for which he was being tried. The presumed effect of such evidence is to predispose the minds oɪ the jurors to believe the accused guilty, and thus effectually to strip him of the presumption of innocence.'" (footnote omitted) (quoting *Commonwealth v. Trowery*, 211 Pa.Super. 171, 173–74, 235 A.2d 171, 172 (1967)).

must have been involved in prior criminal activity. This testimony is not comparable to the repeated references to police photographs of a defendant in *Commonwealth v. Allen*, 448 Pa. 177, 292 A.2d 373 (1972). Nor is it analogous to the police officer's statement that the defendant had previously served time in prison in *Commonwealth v. Clark*, 453 Pa. 449, 309 A.2d 589 (1973). In both *Allen* and *Clark* we reversed convictions because the testimonial references reasonably conveyed the impression that the defendants in those cases had engaged in prior crimes. To conclude that appellant had committed prior crimes from a detective's single statement that he knew where appellant lived, the jury would have to indulge in gross speculation. Accordingly, the trial court did not err in denying this motion for mistrial.

Appellant's second motion for mistrial was based on a reference to his having been in jail. This reference was volunteered by a defense witness during cross-examination. The motion was interposed a considerable length of time after the allegedly prejudicial reference was made, and after the prosecutor had proceeded to cross-examine the witness on totally unrelated matters. Pennsylvania Rule of Criminal Procedure 1118(b) requires that a motion for mistrial be made when the event claimed to be prejudicial to the defendant is disclosed.[3] Accordingly, this motion for mistrial was untimely under Rule 1118(b), and this claim is waived.

Appellant's next claim is that the court erred in permitting the napkin, on which the police officer recorded one of the victim's dying declarations to go out with the jury during its deliberations. As one ground for the impropriety of letting the napkin go out with the jury, appellant argues that the napkin should not have been admitted into evidence in the first instance. However, he concedes that he did not

---

**3.** This requirement of a contemporaneous motion encourages alert advocacy and provides an opportunity for prompt curative instructions. Cf. *Commonwealth v. Waters*, 477 Pa. 470, 384 A.2d 234 (1978); *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

object when the napkin was offered into evidence.[4]  Hence any claim that the napkin was inadmissible is waived.  *Commonwealth v. Clair*, 458 Pa. 418, 421, 326 A.2d 272, 273 (1974).  Appellant's attempt to find support in our decision in *Commonwealth v. Canales*, 454 Pa. 422, 311 A.2d 572 (1973) is patently without merit.  In *Canales*, there was a prompt defense objection interposed when the challenged evidence (the police officer's notes about the defendant's oral confession) was offered for admission into evidence at the conclusion of the prosecution's case.  Prior to that point the notes were only marked for identification, which did not require an objection to their admissibility at that point.

Addressing the basic question as to the propriety of allowing this evidence to go out with the jury we note that Pennsylvania Rule of Criminal Procedure 1114 provides:

"[u]pon retiring for deliberations, the jury shall not be permitted to have a transcript of any trial testimony, nor a copy of any written confession by the defendant, nor a copy of the information or indictment.  Otherwise, upon retiring, the jury may take with it such exhibits as the trial judge deems proper."

The napkin in this case is not among the items which Rule 1114 specifically forbids the jury to have during deliberations.[5]  Since it is clear that the court was not precluded

**4.** In fact, when the prosecution moved for admission of its marked exhibits, of which the napkin was one, the trial court asked the defense attorney if he had any objection, and he replied that he did not.

**5.** We do not accept the reasoning that because the material written on the napkin was read into evidence at trial it was thereby transformed from an exhibit to become "part of the trial transcript." Prior to the amendment of Pennsylvania Criminal Rule 1114 which expressly excluded confessions from being given to the jury during their deliberations, we rejected a similar contention where it was argued that the reading of a confession into evidence precluded it from being sent out with the jury.

"Rule 1114 gives the trial court no discretion with respect to the transcript or the indictment; they may not go with the jury when it retires.  It does grant the court discretion with respect to exhibits. There is no question that appellant's confession was physically identified and received as an exhibit.  The question is whether it

from sending this exhibit out with the jury either because it was inadmissible evidence or because it was prohibited under Rule 1114, the only question remaining is whether the court abused its discretion because by so doing that testimony was given undue emphasis. *See Commonwealth v. Ravenell*, 448 Pa. 162, 292 A.2d 365 (1972).

In assessing the trial court's exercise of discretion in this regard, it is necessary to focus upon the significance of this piece of evidence in relationship to the issues raised during the trial. Appellant does not argue that there was a serious dispute at trial as to the fact that these accusations were leveled against appellant by the victim. Indeed, independent of the napkin, Mrs. DeBose, the victim's mother, Mr. Young and Officer Fiedler all testified as to hearing the victim state that her injuries were caused by appellant. The real controversy centered upon the truthfulness of these accusations. The physical presence of the napkin could in no way lend credence to the verity of the victim's charges. Thus, since any emphasis that may have resulted from the trial court's ruling related to an issue not seriously disputed, we cannot say that the court's action amounted to an abuse of discretion requiring a reversal of the judgments of sentence.

■ Another assignment of error is addressed to the testimony of the victim's sister, Rose DeBose, wherein she testified that the deceased stated to her on the evening of the killing, that Louis was expected to visit the home later that evening. This statement was made at the completion of a telephone call between the deceased and the caller whom the witness identified as Louis Riggins. Appellant contends that this testimony was hearsay and improperly admitted. It is argued that the only purpose for the admis-

somehow lost that status when it was read aloud to the jury and was thereby incorporated into the transcript. Merely to state the question is to answer it. The confession could not lose the status of an exhibit merely by being read aloud because in no sense had anything happened to change its character."
*Commonwealth v. Moore*, 443 Pa. 364, 373, 279 A.2d 179, 184 (1971). *See also Commonwealth v. Ravenell*, 448 Pa. 162, 172, 292 A.2d 365, 370 (1972).

sion of the evidence was to establish the truth of the remark that appellant would be at the home of the deceased later that evening. If, in fact, this was the purpose of the challenged evidence, then appellant would be correct in his assertion that this evidence would represent a classic example of hearsay evidence. However, we are satisfied that this evidence was admissible to show the state of mind of the victim, evidencing her intent to remain at the house and her willingness to admit him. This testimony was particularly crucial in view of the evidence that the house was kept secured and that persons would not be admitted unless known to the occupants. Further, the evidence established an absence of forcible entrance which would tend to prove that the victim knew and freely admitted the intruder or intruders who caused her death. In short, this testimony provided a basis for permitting the jury to conclude appellant had the opportunity to commit the crime in question.

The state of mind exception of the hearsay rule is well established: *Commonwealth v. Thomas,* 410 Pa. 160, 189 A.2d 255 (1963), *cert. denied,* 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83; *Commonwealth v. Wilson,* 394 Pa. 588, 148 A.2d 234 (1959), *cert. denied,* 361 U.S. 844, 80 S.Ct. 97, 4 L.Ed.2d 82; *Commonwealth v. Marshall,* 287 Pa. 512, 135 A. 301 (1926). As Justice (later Chief Justice) Benjamin R. Jones stated for a unanimous Court in *Commonwealth v. Thomas, supra,* 410 Pa. at 170, 189 A.2d at 260, "We admitted such testimony on the ground that the declarations of the deceased indicated an existing intent or state of mind of the deceased-declarant and, since such declarations were made in a 'natural manner' and were material and relevant, their admission could be justified as an exception to the hearsay rule." While it is true that such evidence will not be received as proof of the conduct of the accused (rather it relates to the state of mind of the declarant) the burden has been traditionally placed upon the accused to request a clarifying instruction; in this instance no such instruction was requested.

■ Appellant's final contention is that a portion of the judge's charge to the jury was misleading as to the reasonable doubt standard for proving guilt. However, no specific objection was made to that portion of the charge, and hence this claim is waived, Pennsylvania Rule of Criminal Procedure 1119(b); *cf. Commonwealth v. Cambric,* 475 Pa. 454, 456, 380 A.2d 1224, 1225 (1977).

Judgments of sentence affirmed.

MANDERINO, J., concurs in the result.

JONES, former C. J., did not participate in the decision of this case.