681 A.2d 1305

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Robert Donald AUKER, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 26, 1995.

Decided July 31, 1996.

Reargument Denied Nov. 1, 1996.

James J. Rosini, Shamokin, for Robert Donald Auker.

Robert B. Sacavage, Sunbury, Robert A. Graci, Attorney General's Office, Harrisburg, Gregory A. Stuck, Sunbury, for Commonwealth.

Before NIX, C.J., and FLAHERTY, ZAPPALA, CAPPY, CASTILLE and MONTEMURO, JJ.

## *OPINION OF THE COURT*

ZAPPALA, Justice.

The appellant, Robert Donald Auker, was convicted of murder of the first degree and kidnapping of his former wife, Lori Ann Auker, by a jury in the Court of Common Pleas of Northumberland County. At the sentencing phase, the jury returned a verdict of death. The Court of Common Pleas imposed a death sentence in addition to a consecutive sentence of ten to twenty years for kidnapping. The present direct appeal ensued. Although we affirm Appellant's convictions, we vacate the sentence of death and remand for a new sentencing hearing.

### A. *Background*

The events leading to the convictions in this case can be best understood in three aspects: the discovery and identification of the victim's body; the events surrounding the disappearance of the victim; and appellant's statements.

### 1. *The discovery and identification of the victim's body*

The body was discovered on a hot day, June 12, 1989, by a young woman who was walking down a dirt road near the home of her grandparents. She smelled an odor, investigated and saw a badly decomposed body clad in a jacket, jeans and sneakers. She rushed back home and her family contacted the police. Deputy Coroner Matthew Olley pronounced the body dead and the body was transported to the morgue pending the autopsy by Dr. Isidore Mihalakis, a forensic pathologist.

Dr. Mihalakis opined that the cause of death was homicide. He observed holes in the victim's jacket that continued through the sweater underneath, which were consistent with between seven and ten knife stab wounds in the back and chest area. He concluded the wounds would have impacted the vital organs; however, since the body was essentially skeletonized at the time of the viewing, he could examine no organs because they had disappeared either from insect or decomposition activity. Dr. Mihalakis also turned over scalp hair samples to the police for analysis.

Dr. Mihalakis further confirmed the approximate date of death through the use of an entomological expert, Dr. K.C. Kim, whose specialty is the classification and identification of insects and parasites of humans and animals. Dr. Mihalakis collected samples of the various insects present on and within the corpse for analysis and Dr. Kim examined the insects.

Dr. Kim testified that the presence and relative maturity of insects allowed him to estimate the approximate time of death. He testified that different decomposition stages attract different types of insects. He also explained that ambient air temperature and physical site (open field, shaded locale or aquatic area) also affect the rate of maturity of insects. In determining the approximate decomposition period, Dr. Kim utilized a climate report from the national weather service, description of the autopsy and description of the scene where the corpse was discovered.

When Dr. Kim testified, he identified samples of the insects found on the victim. He was also shown autopsy photographs

depicting a mass of insects on the body and in the body bag. Dr. Kim concluded that accounting for the average mean temperature during the time the corpse had been missing, the maturity of the various insects present and the stages of decomposition at which certain insects would be present, the body had been decaying nineteen days to twenty-five days.

The corpse was identified as Lori Auker through dental records. Lori had been missing since May 24, 1989, and was last seen wearing clothing like that found on the corpse. Nineteen days had elapsed from the date of her disappearance until the discovery of her body on June 12, 1989.

### 2. *Events preceding the disappearance of Lori Auker*

#### a. *Notice of victim's disappearance*

Lori Auker was last seen going to work. Lori lived with her son and her two cats at the home of her parents, Richard and Ruth Auman. She had been living with them since her separation from appellant in October, 1988. At the time of Lori's disappearance, her son was with appellant for a one-week visitation. Ruth Auman last saw Lori at 3:30 p.m. on May 24 as Lori left home, driving a brown 1976 Pontiac LeMans, for her job at a pet store near the Bon Ton entrance of the Susquehanna Mall. At 4:00 p.m., Lori's supervisor called to ask whether Lori was coming to work. Mr. and Mrs. Auman then went to look for Lori, in case she may have had car trouble between home and the mall. When they arrived at the mall, they found Lori's locked car parked near the entrance to her place of employment. Mr. Auman then reported to the state police that Lori was missing.

#### b. *Prior events*

The events preceding Lori Auker's disappearance reflect that she was afraid appellant would hurt her or take away their son and that appellant was following her. Lori was divorcing appellant and was involved in a bitter child custody and support dispute with him. Two to three weeks before her disappearance, Lori's mother had discovered two shotguns

under Lori's bed. Lori explained they were there to protect her if appellant came while her parents were not home and tried to take her son. Lori's friend, Mindy Eroh, also testified that Lori carried mace in her pocketbook in case appellant attacked her and that she was aware Lori kept guns under her bed.

Laurel Gehers, Lori's work supervisor, testified that in the few weeks preceding her disappearance, Lori was afraid that appellant would hurt her. On numerous occasions during that period, appellant would appear in front of the pet store and Lori would run to the back room of the store, stating, "Bob's here, cover for me!" She would continue to hide until he departed. Ms. Gehers stated that this behavior increased near the time of Lori's disappearance.

Lynn Cookson, one of Lori's co-workers, testified that Lori told her about her fear of appellant and about her guns. Close to the time of Lori's disappearance, Ms. Cookson would help Lori leave work by watching Lori from her car because appellant would often wait for her. Lori had told Ms. Cookson about appellant's statement shortly before Lori's disappearance that "if he could not have her [Lori], no one else can." Lori had also told Ms. Cookson about the guns under her bed. And, Ms. Cookson corroborated the testimony of Ms. Gehers regarding Lori's reaction to appellant's appearance in front of the store.

Malcolm Derk was dating Lori and testified that he would escort her in the evening to her car because she was afraid of appellant being around. Two nights before Lori's disappearance, Derk met her at 9:00 p.m. to walk her to her car. When Lori spotted appellant in appellant's car next to her parked car, Lori and Derk left the mall in Derk's car. They returned an hour later to find appellant still there. The couple then returned at 11:30 p.m. and appellant had departed.

c. *Linking the disappearance to appellant*

1) *The 1984 Celebrity and hair in the car*

Appellant's relatives linked him to the use of his parents' 1984 Chevrolet Celebrity on May 24, 1989. Appellant lived

with Mr. and Mrs. Donald Auker, both adoptive parents of appellant. According to Mrs. Auker, appellant drove their Celebrity on May 24 and arrived home between 5:00 and 5:30 p.m. Mr. Auker was displeased that appellant drove the car on May 24 because he was not permitted or insured to use the Celebrity. The next day, Mr. Auker decided to trade the car for a truck and did so on May 27. Harry Hartman, husband of appellant's natural mother, resided across the street from the Auker residence and testified that appellant used the Celebrity on May 24 and that he observed appellant on May 25 "meticulously" vacuuming the passenger side of the front of the Celebrity and vacuuming and scrubbing its trunk, which struck him as unusual behavior for appellant.

The Celebrity was traded to Jack Miller, a local car salesman, on May 27, and only Miller and Ray Benner were inside the vehicle before it was wholesaled to Todd Brosious, owner of Todd's Auto Sales, on May 27. The car was sent to be cleaned; however, the cleaners needed only to vacuum the vehicle for foot dirt. After cleaning, Todd Brosious took the vehicle to the local auction and, on June 8, Jim Eby bought it for a friend who by coincidence was a state trooper. The trooper cooperated with the state police's request of the vehicle for analysis. All who had been inside the vehicle from the time of trade provided hair samples to ensure that none of their hair would be confused with the hair of appellant or the victim.

Human hairs were removed by a state police criminologist and forensic scientist from the front passenger side of the Celebrity in the upper door seal and from the door jamb. The hairs were similar to those of Lori Auker. Hairs from Lori's cats were found in the trunk area and on the appellant's Velcro splint which he wore on the date of Lori's disappearance.[1] The cat hairs were an identical match. Mr. Auker indicated that there were no cats in the Auker household.

---

1. The trunk mat had been replaced and no dirt or hair was found on the new mat.

## 2) *The video from the automated teller machine*

A local bank had an automated teller machine located outside the entrance to the victim's workplace. The machine had a security camera that photographed the location directly in front of it at ten-second intervals. At 3:47.24 p.m., the tape displayed a woman wearing clothing like the victim's clothing walking from the area where her car had been parked toward the mall. In the next frame, taken at 3:47.34 p.m., the same woman was leaning into an open front passenger door of a vehicle that had pulled across her path and was stopped with its brake lights on in the wrong lane of travel. No other frame of film showed the woman or the car on May 24.

The incident was reenacted and a process known as digital image enhancement [2] was used to support the Commonwealth's argument that the car in the video was the Celebrity appellant had used on May 24. The bank permitted the use of the video camera in a reenactment of the incident using the Celebrity. Through the assistance of specialists, the Commonwealth compared the videos of the May 24 incident with the reenacted incident in both unenhanced and enhanced format. A Chevrolet representative testified that the vehicles depicted in the original and the reenactment photos appeared to be Chevrolet Celebrities within certain production years including 1984.

### 3. *Appellant's statements*

Appellant made several alibi statements.[3] Appellant told police that on the day of Lori's disappearance, he talked with a salesman at Sears in the Bloomsburg Mall to price a dishwasher and returned home between 5:00 and 5:30 p.m. Appel-

---

**2.** The enhancement technology was used to clarify the picture from the Mac machine because of the poor tape quality. The enhancement did not add or take way from the subject matter of the picture; rather it lightened or darkened the field of the picture.

**3.** Appellant said he picked up his paycheck at Weis Markets on May 24. A witness said appellant did so and that he was wearing a black coat and a Velcro splint. Another witness verified that appellant had gone to Sun Orthopedic Group. Neither of these facts is inconsistent with kidnapping in mid-afternoon on May 24.

lant also told police that he had had no contact with his wife on May 24 and that he and his wife were on a friendly basis. He denied any knowledge of the area where the body was discovered. He further told the police that he had an insurance policy on himself and his family for ten thousand dollars. Later, he told the police that his brother, Stephen Krist, had confessed to him on July 13 that Krist killed Lori to get even with the Auman family.

The record reflects the following. No salesperson at Sears remembered seeing appellant on May 24.[4] The only Sears appliance person who had contact with appellant was Jim Kline, not on May 24 but on May 30. Appellant had approached Mr. Kline and wanted him to provide a writing that would evidence that he had been in the store to price dishwashers. He explained that, "They want to know where I am at all times." Appellant had no idea which dishwasher he had seen. Kline wrote the note for May 30; however, appellant made him redo it for May 24 at 5:30 p.m. which he did because "the customer is always right." [5]

Lori's attorney testified that the parties were not getting along and that they were engaged in a bitter custody dispute. On the day Lori disappeared, she had filed for modification of support. Appellant had previously told his supervisor at Weis Markets that he would kill his wife to avoid making payment and to make sure no one could take his child away. Another

4. One salesman was in the department for one-half hour, 5:00 to 5:30 p.m., on May 24 and he does not remember seeing appellant. Two saleswomen were in the Sears appliance department during the 12:30 to 9:00 p.m. shift on May 24. Neither one remembered appellant.

One knew she would remember the name because her brother-in-law and nephew had the same name, Robert Auker. The other person was the top salesperson for Sears at the time who made her money on commissions. Her commissions were protected, she explained, by use of a book which allowed salespersons to record the name of any customer with whom contact was made so as to protect his or her commission should a sale occur within five days. She testified she would always talk to customers and record their names in the book because that was how she made her money.

5. He checked the book beforehand and did not see appellant's name for May 24.

witness testified that appellant was familiar with the area where the body was found.

Appellant had applied for life insurance on his family pursuant to an application received by Montgomery Ward Life on March 16, 1989, six months after the parties separated and two months prior to the victim's disappearance. The policy was a two hundred thousand dollar accidental death and dismemberment policy which was issued only for appellant. On June 14 and 15, 1989, within two and three days of the victim's discovery, appellant contacted the insurance company and advised that the policy had been improperly issued, as it should have had spousal coverage. Wards noted the error and reissued the policy with coverage for the spouse. Appellant did not inform Wards of Lori's death in the telephone calls, even though he had been informed of the discovery of Lori's body on June 12. Appellant waited until June 23 to do so. (The payout for criminal homicide would have been ten thousand dollars.)

Stephen Krist denied he ever told his brother he had killed Lori to get even with the Auman family. Krist produced proof that he was working on July 13, the date of the supposed confession, at a site two hundred miles from appellant's home. Krist also testified that his knife had been missing since he had stayed with appellant.

## B. *Discussion*

Appellant first argues that the evidence was insufficient to support his convictions. This court is required in capital cases to review the sufficiency of the evidence, particularly with respect to the first degree murder conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983) rehearing denied, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983). The applicable standard of review is whether, viewing all the evidence in the light most favorable to the Commonwealth as verdict winner, a jury could find that every element of the crime exists beyond a reasonable doubt. *Commonwealth v. Bryant*, 524 Pa. 564, 567, 574

A.2d 590, 592 (1990). This standard is equally applicable in cases where the evidence is circumstantial rather than direct provided that the combination of the evidence links the accused to the crime beyond a reasonable doubt. *Commonwealth v. Murphy,* 540 Pa. 318, 324, 657 A.2d 927, 930 (1995).

 To prove murder of the first degree, the Commonwealth must demonstrate that the defendant killed with a specific intent to kill. 18 Pa.C.S. § 2502. The Commonwealth must show: 1) that a human being has unlawfully been killed; 2) that the defendant did the killing; and 3) that the killing was done in an intentional, deliberate and premeditated manner. *Commonwealth v. Mitchell,* 528 Pa. 546, 550, 599 A.2d 624, 626 (1991). If deadly force is knowingly applied by the defendant to another, the specific intent to kill is as evident as if the defendant stated the intent to kill at the time the force was applied. *Commonwealth v. Meredith,* 490 Pa. 303, 311, 416 A.2d 481, 485 (1980). To prove kidnapping in this case, the Commonwealth had to demonstrate that the defendant unlawfully removed another a substantial distance under the circumstances from the place where the victim is found with intent to inflict bodily injury on, or to terrorize, the victim or another. 18 Pa.C.S. § 2901.

On review of the record, the Commonwealth has demonstrated that Lori Auker was unlawfully killed, appellant did the killing and the killing was done in an intentional, deliberate and premeditated manner. Experts testified that the cause of death was unnatural due to the remote location and the position and condition of the body, that the manner of death was homicide and that the possible date of death included May 24, the day that Lori Auker disappeared. Dr. Mihalakis observed holes in the jacket and sweater which he concluded were between seven and ten knife stab wounds in the back and chest area. He concluded that the wounds would have impacted the vital organs; however, no examination could occur because the organs had disappeared either from insect activity or decomposition. Dr. Kim testified that the presence and relative maturity of insects on the body, with due consideration to the ambient air temperature and the

physical site, led him to conclude that the body had been decaying for nineteen to twenty-five days. The corpse was identified as Lori Auker through dental records. She had been missing for nineteen days, since May 24, 1989, when she was wearing clothing like that found on the corpse.

Appellant was connected to the crime by the May 24 film from an automated teller machine video camera and through strands of human and cat hair. One frame of the automated teller machine film showed a woman wearing clothing like the victim's clothing walking toward the camera. The next frame showed the same woman leaning into an open door of a Celebrity that had pulled across her path and was stopped with its brake lights on in the wrong lane of travel. The car in the video was like the 1984 Celebrity appellant had used without his parents' permission on May 24. On May 25, appellant "meticulously" vacuumed the passenger side of the front of the Celebrity and vacuumed and scrubbed its trunk. Human hairs later found in the Celebrity's upper door seal and from the door jamb were similar to those of Lori Auker. Hairs presumably on Lori's body from Lori's cats were found in the trunk and on appellant's Velcro splint.

Appellant's alibi statements and other statements either were not inconsistent with kidnapping of the victim or were proven to be contradictory. Appellant told the police he talked with a salesman at Sears in the Bloomsburg Mall to price a dishwasher; however, he did not. Appellant denied knowledge of the area where the body was found; however, the record reflects he knew the site. Appellant said he had had no contact with his wife on May 24; however, the circumstantial evidence of the automated teller machine film and the evidence in the car contradicts his statements. Appellant claimed that his brother told him in person on July 13 that he killed Lori; however, Krist was working July 13 at a site two hundred miles away from appellant.

Other relevant statements were demonstrated to be contradictory. He claimed that he and Lori were on a friendly basis; however, Lori was very much afraid appellant would hurt her or take away their son, so she kept guns under her bed and

mace in her purse, and hid from appellant when she saw him approaching her. Also, their custody dispute was acrimonious. Appellant said he had an insurance policy on himself and his family for $10,000; however, the $10,000 payout occurred when a spouse was killed by criminal means. The evidence is more than sufficient to demonstrate that appellant had, at the time of the killing, a specific intent to kill Lori Auker and to support the conclusion that appellant committed an intentional killing for purposes of the first degree murder conviction.

The Commonwealth has also demonstrated that appellant unlawfully removed Lori Auker a substantial distance from the place where she was found with intent to inflict bodily injury on her or to terrorize her. The automated teller machine video indicates that the victim and appellant were last seen at the mall with Lori at the open door of appellant's car. The relationship between the two was not one where Lori would have voluntarily entered the car with appellant moments before she was to appear for work. Many stab wounds constituting severe bodily injury were inflicted on the victim who was found a substantial distance from the mall where she worked. The evidence is more than sufficient to demonstrate that appellant kidnapped Lori Auker.

Appellant next contends that the verdict was contrary to the weight of the evidence. A trial court may award a new trial on this basis only where the verdict is so contrary to the evidence as to shock one's sense of justice and make the award of a new trial imperative. Upon review of the record, appellant has failed to demonstrate that the verdict was contrary to the weight of the evidence.

Appellant's next claim is a series of alleged errors by the trial court. He first contends that the trial court erred when it denied appellant's motion for change of venue or venire. In order to obtain a new trial on the issue of change of venue, defendant must demonstrate that the pretrial publicity was inherently prejudicial, that it saturated the community and that the community did not have sufficient time to cool down from the effects of the publicity. *Id.* Factors to

consider in analyzing whether the pretrial publicity was inherently prejudicial include whether the publicity: was factual and objective or consisted of articles that were sensational, inflammatory and demanded conviction; revealed the existence of the accused's prior criminal record; referred to confessions, admissions or reenactments of the crime by the defendant; or was based on information reported by the police and prosecutorial officers. *Id.*

Assuming inherently prejudicial publicity is established, the next inquiry is whether such publicity has been so extensive, sustained and pervasive that the community must be deemed to have been saturated with it. *Id.* And, even so, it must be demonstrated that the community has had no cooling-off period which would significantly dilute the prejudicial effects of the publicity. *Id.* The test of the cooling-off period lies in the voir dire of the potential jurors. *Commonwealth v. Breakiron,* 524 Pa. 282, 571 A.2d 1035 (1990).

Here, appellant only generally refers to the pretrial publicity without any specifics. He fails to demonstrate that the publicity was prejudicial or was so widespread as to saturate the community with news of the crime. Further, assuming widespread prejudicial publicity, the record of the voir dire reflects that the jurors did not have substantial knowledge of the case, had not formed fixed opinions as to appellant's guilt or innocence and were prepared to make their determination on the facts presented in court. On review of the record, the trial court did not abuse its discretion by denying appellant's motion for change of venue or venire.

Appellant's second argument is that the trial court erred when it denied his motion for continuance to investigate alleged new evidence. The denial of a continuance by the trial judge constitutes reversible error only if there has been an abuse of discretion. *Commonwealth v. Howard,* 466 Pa. 445, 353 A.2d 438 (1976). Here, three days before trial, appellant sought a continuance to investigate an alleged link with a man named Michael Egan. Appellant failed to specify any evidence that might be revealed from such an investigation. The trial

court concluded that, in light of these circumstances, the grant of a continuance would have resulted in an unnecessary delay. Appellant has failed to demonstrate an abuse of discretion by the trial court.

Appellant's third argument is that the trial court erred when it permitted Thomas Puchalski to testify as to his interpretation of a video film, an issue of fact which was solely for the jury. Appellant argues that the witness should not have been qualified as an expert because he was not an engineer or a design expert, had never testified before and had not interpreted photographs. Further, he argues that the witness should not have been permitted to compare an original photograph of a car and an enhanced version of the same photograph as that was an issue of fact for the jury.

Expert testimony is permitted as an aid to the jury when the subject matter is distinctly related to a science, skill or occupation beyond the knowledge or experience of the average layman. *Commonwealth v. O'Searo*, 466 Pa. 224, 229, 352 A.2d 30, 32 (1976). Where a witness has a reasonable pretension to specialized knowledge on a subject under investigation, the witness may testify and the weight to be given to such testimony is for the jury to decide. Expertise, whether acquired as a result of formal education or by experiences, is expertise. Here, the witness was qualified by his twenty years of experience with the product. He had the ability to identify his product and render an opinion within a reasonable degree of certainty that the vehicle depicted was a Chevrolet Celebrity manufactured during a three-year period due to the tail light configuration. Further, the witness did not testify as to whether the Celebrity in each picture was the same Celebrity, the issue being properly that of the jury to resolve. The record reflects that this witness had special knowledge that assisted the jury in their findings and, therefore, no abuse of discretion occurred.

Appellant's fourth contention is that the trial court improperly excluded testimony concerning charges or plea agreements involving his brother, Stephen Krist, whom appel-

lant accused of the killing. The scope and the manner of cross-examination are within the sound discretion of the trial judge whose decisions will not be overturned absent an abuse of discretion. Appellant argues that an in-chambers colloquy concerning Krist should have been conducted on cross-examination in open court so that the jury could hear and assess a possible bias or motive for Krist's testimony.

The record includes an in-camera hearing to determine what evidence the defense could use to impeach Krist. At the time of trial, Krist had been charged with, but not convicted of, embezzlement and had had a previous theft charge disposed of by A.R.D. Neither event was a permissible basis for impeachment. The defense indicated no desire to question the witness on any other charge. The defense failed to inquire into any possible deals this witness may have had with the Commonwealth; the court did not prevent this line of inquiry. Appellant has demonstrated no error.

Appellant's fifth claim is that the trial court abused its discretion during the guilt phase in admitting into evidence photographs of the victim covered with insects. He argues the inflammatory nature of the photographs outweighed any evidentiary value. Photographs of a murder victim are not *per se* inadmissible. *Commonwealth v. Lee,* 541 Pa. 260, 278, 662 A.2d 645, 654 (1995). It is the manner in which a corpse is displayed that may cause photographs to be emotionally charged. *Commonwealth v. Chester,* 526 Pa. 578, 591–92, 587 A.2d 1367, 1373–74, *cert. denied,* 502 U.S. 959, 112 S.Ct. 422, 116 L.Ed.2d 442 (1991). The admission of such photographs is a matter within the sound discretion of the trial judge and only an abuse of discretion will constitute reversible error. *Commonwealth v. Jacobs,* 536 Pa. 402, 406, 639 A.2d 786, 788 (1994).

When the trial judge is confronted with gruesome or potentially inflammatory photographs, the test for determining their admissibility is whether the photographs are inflammatory and, if so, whether they are of "such essential evidentiary value that their need clearly outweighs the likeli-

hood of inflaming the minds and passions of the jurors." *Commonwealth v. McCutchen,* 499 Pa. 597, 602, 454 A.2d 547, 549 (1982). If an inflammatory photograph is merely cumulative of other evidence, it will not be deemed admissible. *Commonwealth v. Chester, supra.* And, while a criminal homicide trial is unpleasant, we cannot, as we said in *McCutchen,*

> ... permit the disturbing nature of the images of the victim to rule the question of admissibility [for to do so] would result in exclusion of all photographs of the homicide victim.... There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

499 Pa. at 602, 454 A.2d at 549 (1982). Further, even where the body's condition can be described through testimony from a medical examiner, such testimony does not obviate the admissibility of photographs. *Id.* at 603, 454 A.2d at 550.

Both color and black-and-white photographs taken at the scene of discovery and at the autopsy were presented at trial. Seven black-and-white photographs of the body at the scene were presented to show the jury the unnatural position of the body in a secluded wooded area on a steep ravine and in a decomposing state.[6] The autopsy photographs included color and black-and-white photographs. Thirteen color photographs of the stained, knifed clothing and one small color photograph of the insects in the body bag without the body, were presented. Two black-and-white photographs of the insects on the body were also presented. The first black-and-white photograph was of a totally jeans-clad lower body from below the knees down to the sneakers. The other was of the body from the position of the sneakers so that the decomposition of the upper body was not clearly visible.

---

6. One color photograph showed the scene; however, it was at such a distance that no insects and little body deterioration could be clearly seen in the photograph.

The photographs of the body with insects were all black-and-white. They were presented to assist the jury in understanding Dr. Kim's scientific testimony about the presence of various insects and the use of entomology in determining the relative date of death of the victim.[7] As Dr. Kim testified, the approximate date of death could be determined by the presence of certain types of insects on the skeletal remains at that specific site and climate. Thus, the pictures helped the jury to understand and evaluate that testimony.

The trial court took adequate precautions to ensure that the photographs did not inflame the passions of the jury. Prior to the presentation of the black-and-white photographic evidence, the trial court warned the jury of the nature of the photographs and limited the period of time for viewing them. Additionally, the court did not allow any of the photographs to be taken out with the jury.

On review of the record, appellant has demonstrated no abuse of discretion in the admission of the photographs. The pictures are unpleasant; however, their disturbing nature does not control the question of admissibility. By viewing the deterioration of the victim's body, the jurors were better able to understand and evaluate the testimony concerning the victim's date of death, which was a critical issue in the case. Appellant has failed to demonstrate that the trial court abused its discretion in determining that the need for the black-and-white photographs outweighed the likelihood of inflaming the minds and passions of the jurors, particularly in light of the court's cautionary remarks and its limitations on viewing the pictures. Appellant's claim fails.

■■■■■ Appellant next argues the trial court erred in permitting Ruth Auman, Mindy Eroh and Laurel Gehers to testify as to conversations with the victim immediately preceding her death because such testimony was hearsay. Testimo-

---

7. The date of death was a critical, disputed issue in this case. Defense counsel argued in his closing that Dr. Kim's testimony was not credible and that Dr. Kim's testimony did not support a conclusion that Lori Auker died on May 24. He also posited that if she did not die then, there was no proof linking appellant to her killing.

ny concerning the relationship between a defendant and a decedent like any other evidence is subject to the general evidentiary rules governing competency and relevancy, including hearsay. *Commonwealth v. Myers,* 530 Pa. 396, 400–01, 609 A.2d 162, 164–65 (1992). State of mind is a recognized exception to the hearsay rule for statements are admitted not for the truth of the statements but to show the mental state of the person making such statements. *Commonwealth v. Riggins,* 478 Pa. 222, 234, 386 A.2d 520, 526 (1978).

The record reflects that the testimony of these witnesses was both competent and relevant to demonstrate the victim's state of mind with respect to the charge of kidnapping. Although a victim's fear of a defendant is irrelevant to the charge of criminal homicide, *Commonwealth v. Thornton,* 494 Pa. 260, 431 A.2d 248 (1981), it is relevant to a charge of kidnapping, since one of the issues is the victim's willingness to go with appellant. Here, the testimony of these three witnesses was introduced to demonstrate that due to the victim's fear of appellant, she would not willingly have gone anywhere near him, let alone in a vehicle with him. Appellant's claim fails.

Appellant's final series of claims allege that trial counsel provided ineffective assistance. When asserting claims of ineffective assistance of counsel, *Commonwealth v. Pierce,* 515 Pa. 153, 159–60, 527 A.2d 973, 975–76 (1987), and subsequent cases require a defendant to demonstrate: (1) the underlying claim is of arguable merit; (2) counsel's performance was unreasonable; and (3) counsel's ineffectiveness prejudiced defendant. Claims of ineffective assistance of counsel are not cognizable during post-trial proceedings when the claimant has previously insisted on self-representation because, having knowingly and voluntarily waived the right to counsel, an appellant is not permitted to rely on his own lack of legal expertise as a ground for a new trial. *Commonwealth v. Griffin,* 537 Pa. 447, 644 A.2d 1167, 1170–71 (1994). There is no constitutional right to act as co-counsel. *Commonwealth v. Bryant,* 524 Pa. 564, 570, 574 A.2d 590, 593 (1990).

Many of appellant's claims arise as a result of his continuing attempts to act as co-counsel. The record reflects that, after extensive colloquys on each occasion, the trial court did not permit appellant to act as co-counsel except on one occasion during the defense phase when appellant acted as his own counsel with trial counsel present as stand-by counsel. Thereafter, appellant decided he wanted his appointed counsel who was reappointed and gave the closing argument on appellant's behalf.

 Appellant's first two arguments are that counsel failed to interview and call witnesses whose identities were provided to counsel by appellant. To establish a claim that counsel was ineffective for failing to investigate or call witnesses, an appellant must show how the testimony of the uncalled witness would have been beneficial under the circumstances of his case. *Commonwealth v. McNeil*, 506 Pa. 607, 617, 487 A.2d 802, 807 (1985). A failure to call a witness is not *per se* ineffective assistance of counsel for such decision generally involves a matter of trial strategy. *Commonwealth v. Smallwood*, 497 Pa. 476, 442 A.2d 222 (1982).

On review of the record, appellant's claims are meritless. The record reflects that appellant failed to disclose the identity of some witnesses to counsel and disclosed the identities of the others a day before trial was to begin. In all cases, appellant was unable to show that the witnesses had something to offer to help the defense. With respect to witnesses not called, appellant has failed to demonstrate that the testimony of any of these witnesses would have been helpful to his defense. Further, appellant's claims weaken even more by what the trial court called appellant's "ever changing story as to what occurred on the day in question" which resulted in counsel's unwillingness to participate in appellant's deceptions. Finally, when appellant assumed defense of his case at one point in the trial, calling several witnesses on his own behalf, the court even recessed to allow the state police to go out and find a witness desired by appellant. It later asked if appellant desired to call any further witnesses and he indicated that he

did not. Appellant has either waived his claims or failed to demonstrate any merit to his claims as to these witnesses.

Appellant next claims counsel was ineffective for failing to require the attendance of Thomas Forgas of the Federal Bureau of Investigation to provide expert testimony, to follow lines of questioning requested by appellant or to secure the services of experts requested by appellant. The record reflects that Forgas' testimony would have gone to the evidence surrounding the Chevrolet Celebrity parked in the mall parking lot. Expert testimony at trial identified the vehicle in the parking lot as a Chevrolet Celebrity but did not conclude that the vehicle was the same Celebrity as the one driven by appellant. Trial counsel need not introduce expert testimony on his client's behalf if he is able effectively to cross-examine witnesses and elicit helpful testimony. *Commonwealth v. Williams*, 537 Pa. 1, 29, 640 A.2d 1251, 1256 (1994). Defense counsel cross-examined the Commonwealth experts on this issue and appellant has failed to identify what additional, non-cumulative evidence could have been produced by Forgas.

The claim concerning lines of questioning is without merit. Decisions concerning lines of questioning to pursue should be left to counsel, absent a positive demonstration that a given line of questioning would be helpful to the defense, because counsel is in the best position to know what is in the best interests of his client. Appellant has failed to make the requisite demonstration.

The claim concerning experts is also without merit. The record reflects that trial counsel engaged the services of Dr. Neil Hoffman, a forensic pathologist, Dr. Paolucci, a clinical psychiatrist, and Dr. Peter DeForest, an expert in criminalistics, to review the various reports of the experts of the Commonwealth. Counsel's cross-examinations of Commonwealth experts were based on consultations with and the reports of these various experts.

Appellant's next claims are that counsel failed to investigate possible alibi witnesses and other people who had a

motive and ability to commit the crime. Failure by counsel to conduct a more intensive investigation, in the absence of any indication that such investigation would develop more than was already known, is not error. The record reflects that counsel did attempt to investigate as requested by appellant; however, the investigator for the defense was unable to obtain any helpful witnesses. Also, the record reflects that counsel would not take certain alibi evidence to the district attorney because he viewed them as "stories" and to do so would have violated counsel's rules of professional conduct. Appellant failed to demonstrate error regarding counsel's attempt to present the case in the best way possible without allowing false testimony to become part of the record.

Appellant's final claim of ineffectiveness is that counsel failed to raise the issue of jurisdiction with respect to the kidnapping and murder charges. A county may take jurisdiction over a criminal case where some overt act is involved in the crime that occurred in that county. *Commonwealth v. Tumolo*, 455 Pa. 424, 427, 317 A.2d 295, 297 (1974). Appellant committed a series of illegal acts that ended with the death and dumping of the body in Northumberland County. Since a portion of the crime was committed in Northumberland County, the trial court properly assumed jurisdiction. Appellant has failed to demonstrate ineffective assistance of counsel.

Appellant finally raises several errors concerning the propriety of the imposition of the sentence of death. Appellant initially contends that the sentence of death is invalid because the Commonwealth failed to prove the aggravating circumstance that the killing was committed in the perpetration of a felony, i.e., kidnapping. 42 Pa.C.S. § 9711(d)(6). This claim is meritless. As previously discussed, the record established that Lori Auker was terrified of appellant, would have no contact with him and would not have voluntarily entered into a car with appellant moments before she was to appear to work, except through deceit, coercion or force.

Appellant also contends that the Commonwealth failed to present sufficient evidence of the aggravating circumstance that the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8). We agree. As Chief Justice Nix noted in *Commonwealth v. Nelson*, 514 Pa. 262, 523 A.2d 728 (1987),

The aggravating circumstance provides an additional element to the intentional killing which justifies the ultimate sentence. Thus subsection 8 of section 9711 must of necessity require more than a mere intent to kill. Implicit in subsection 8 is the requirement of an intent to cause pain and suffering in addition to the intent to kill.

*Id.* at 279–280, 523 A.2d at 737. (footnote omitted). Neither the efficacy of the means employed by a defendant to murder his victim nor the immediacy of death is in itself determinative of the question whether the offense was committed by means of torture. *Commonwealth v. Caldwell*, 516 Pa. 441, 448, 532 A.2d 813, 817 (1987). There must be an indication that the killer was not satisfied with the killing alone. *Commonwealth v. Edmiston*, 535 Pa. 210, 236, 634 A.2d 1078, 1091 (1993).

Applying these concepts to the instant case, we find that the acts of appellant, although heinous, appear to be simply the means to carry out the murder of his ex-wife. Appellant forcibly placed the victim into his car and later into its trunk. He then transported Auker to a secluded wooded area, inflicted seven to ten stab wounds upon her, and left her to die. The evidence did not demonstrate that appellant possessed more than the intent to kill or that he was not satisfied with the killing alone.

In many homicides, the victim suffers considerable pain and anguish. Yet a conviction of first degree murder does not always result in the imposition of a sentence of death. Only a narrow category of circumstances set forth in § 9711(d) warrant the most severe penalty. As the Commonwealth failed to establish beyond a reasonable doubt that appellant intended to inflict pain beyond that which accompanied the intentional killing, the aggravating circumstance of torture was not established.

■■■ Because of our disposition of this issue, we need not address Appellant's remaining contentions concerning the penalty phase.[8] As we have determined that sufficient evidence supports the aggravating circumstance that the killing was committed while in the perpetration of a felony and because the jury found one mitigating circumstance, 42 Pa.C.S. § 9711(e)(8),[9] a new sentencing hearing is warranted pursuant to 42 Pa.C.S. § 9711(h)(4).

MONTEMURO, J., who was sitting by designation, did not participate in the decision of this case.

FLAHERTY, J., files a Dissenting Opinion in which CASTILLE, J., joins.

FLAHERTY, Justice., dissenting.

I join the majority's affirmance of appellant's conviction, but I dissent to the holding that there was insufficient evidence to support the finding of the aggravating circumstance of torture. I would affirm both the conviction of first degree murder and the sentence of death.

42 Pa.C.S. § 9711(d)(8) states that an aggravating circumstance is a killing by means of torture. Torture is the intentional infliction of a considerable amount of pain and suffering on a victim which is unnecessarily heinous, atrocious or cruel manifesting exceptional depravity. *Commonwealth v. Thomas,* 522 Pa. 256, 277, 561 A.2d 699, 709 (1989). There must be an indication that the killer was not satisfied with the killing alone. *Commonwealth v. Edmiston,* 535 Pa. 210, 236, 634 A.2d 1078, 1091 (1993). Torture includes the infliction of

---

**8.** Specifically, Appellant contends that the trial court erred: (1) by failing to conduct a proper in-chambers colloquy to determine that appellant was properly informed regarding his rights in the sentencing phase; (2) by denying appellant's motion to strike aggravating circumstances for failure of the Commonwealth to comply with Pa.R.Crim.P. 352; and, (3) by improperly instructing the jury regarding the definition of torture.

**9.** The jury found as other evidence of mitigation the fact that a prison nurse testified concerning appellant's care of another inmate.

intense pain to punish or coerce someone; it is torment or agony or anguish of body or mind. *Commonwealth v. Nelson,* 514 Pa. 262, 279, 523 A.2d 728, 737 (1987).

I believe the record belies the majority's conclusion that the Commonwealth failed to prove torture as an aggravating circumstance. The record reflects that: Lori Auker was forcibly placed in appellant's car, as shown by the presence of Lori's hair in the door jamb; she was forcibly placed in the trunk of the car, as shown by the presence of her cat's hair in the trunk; and she was subjected to the fear, anguish, and physical punishment of having to ride in appellant's trunk. There was no evidence that Lori was dead before reaching the site, as no blood was found in the car or in the trunk. Further, there was no evidence that the victim immediately died from the numerous, painful stab wounds, so the jury could reasonably have inferred that Lori Auker was left alone to bleed to death and suffer greatly in the steep ravine.

I believe these facts, viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to support beyond a reasonable doubt the jury's finding that the murder was committed by means of torture. The majority's contrary conclusion, I believe, reflects the personal views of the justices rather than a proper application of our appellate standard of review.

CASTILLE, J., joins this dissenting opinion.