J-S41045-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| KHAILYL A. CHAMBERS | : | |
| | : | |
| Appellant | : | No. 3860 EDA 2016 |

Appeal from the PCRA Order December 16, 2016
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s):  CP-46-CR-0004747-2010

BEFORE:   GANTMAN, P.J., OLSON, J., and STEVENS*, P.J.E.

MEMORANDUM BY GANTMAN, P.J.:                   **FILED SEPTEMBER 21, 2018**

Appellant, Khailyl A. Chambers, appeals from the order entered in the Montgomery County Court of Common Pleas, which denied his first petition brought pursuant to the Post-Conviction Relief Act ("PCRA").[1]  We affirm.

In its opinion, the PCRA court correctly set forth the relevant facts and procedural history of this case.  Therefore, we have no reason to restate them.  We add that Appellant filed his **final**, amended PCRA petition on April 25, 2016.

Appellant raises the following issues for our review:

> THE UNITED STATES SUPREME COURT HAS HELD THAT A SENTENCE OF MANDATORY LIFE IMPRISONMENT WITHOUT PAROLE FOR JUVENILE OFFENDERS VIOLATES THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION (***MILLER V. ALABAMA***, 567 U.S. 460 (2012)) AND THAT

---

[1] 42 Pa.C.S.A. §§ 9541-9546.

---

*   Former Justice specially assigned to the Superior Court.

THIS IS TO BE APPLIED RETROACTIVELY (***MONTGOMERY V. LOUISIANA***, 136 S.CT. 718 (2016)).   DID THE HONORABLE COURT ERR…IN FAILING TO RE-SENTENCE APPELLANT ON THEORIES THAT (I) APPELLANT WAS ONLY 13 DAYS PAST HIS 18TH BIRTHDAY ON THE DATE THAT THE INSTANT OFFENSES OCCURRED AND (II) APPELLANT MAY PROPERLY BE CONSIDERED A JUVENILE FOR THE PURPOSES OF THE INSTANT SENTENCE OF MANDATORY LIFE IMPRISONMENT BECAUSE, UNDER THE PENNSYLVANIA JUVENILE ACT, APPELLANT COULD HAVE BEEN SUPERVISED AS A JUVENILE UNTIL HE WAS 21 YEARS OF AGE (42 PA.C.S. § 6302, *ET SEQ.*)[?]

WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO INTERVIEW CHARLES HERNANDEZ (WHO WAS ORIGINALLY CHARGED WITH CRIMINAL SOLICITATION TO COMMIT THE INSTANT HOMICIDES), AND/OR OTHERWISE INVESTIGATE WHETHER CHARLES HERNANDEZ COULD PROVIDE EXCULPATORY EVIDENCE AT TRIAL (PARTICULARLY IN LIGHT OF THE EVIDENCE INTRODUCED AT THE PCRA HEARING THAT MR. HERNANDEZ HAD WRITTEN TRIAL COUNSEL A LETTER ESSENTIALLY OFFERING TO TESTIFY ON APPELLANT'S BEHALF AT TRIAL)[?]

WAS TRIAL COUNSEL INEFFECTIVE FOR FAILING TO CALL CHARLES HERNANDEZ (WHO WAS ORIGINALLY CHARGED WITH CRIMINAL SOLICITATION TO COMMIT THE INSTANT HOMICIDES) TO TESTIFY AT TRIAL (PARTICULARLY IN LIGHT OF THE EVIDENCE INTRODUCED AT THE PCRA HEARING THAT MR. HERNANDEZ HAD WRITTEN TRIAL COUNSEL A LETTER ESSENTIALLY OFFERING TO TESTIFY ON APPELLANT'S BEHALF AT TRIAL)[?]

(Appellant's Brief at 2).

After a thorough review of the record, the briefs of the parties, the applicable law, and the thorough opinion of the Honorable Thomas P. Rogers, we conclude Appellant's issues merit no relief.   The PCRA court opinion comprehensively discusses and properly disposes of the questions presented. (***See*** PCRA Court Opinion, filed January 17, 2018, at 15-23) (finding: **(1)**

Pennsylvania courts have not extended holding in *Miller* to individuals who reached age of 18 before commission of offenses; charge of homicide mandates removal of matter from jurisdiction of juvenile court, therefore Appellant cannot argue he could be subject to supervision under Juvenile Act; **(2-3)** Appellant has not demonstrated Mr. Hernandez was either available or willing to testify; Appellant failed to show how Mr. Hernandez's testimony would have been helpful to Appellant's defense; Mr. Hernandez readily admitted he did not see who shot Victims and did not see Appellant at time of murders; Mr. Hernandez's testimony that he did not solicit Appellant to murder Victims might have rebutted Commonwealth's theory of motive but did not otherwise address whether Appellant committed murders, was not exculpatory, and would not have materially aided Appellant's defense; trial counsel had reasonable basis for not calling Mr. Hernandez as witness because trial counsel said he wanted to keep any evidence of motive out of case; had Mr. Hernandez testified at Appellant's trial, Commonwealth was prepared to present witnesses tying Mr. Hernandez to one of Victims to provide motive for murders; because trial counsel had reasonable basis for keeping evidence of motive out of case, and was successful in doing so, Appellant cannot reasonably claim to have been prejudiced by counsel's decision not to call Mr. Hernandez at trial; Appellant's claims of ineffective assistance of counsel fail). The record supports the PCRA court's rationale. Accordingly, we affirm on the basis of the PCRA court opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>9/21/18</u>

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY,
PENNSYLVANIA
CRIMINAL DIVISION**

COMMONWEALTH OF PENNSYLVANIA    :    SUPERIOR COURT
                                         :    NO. 3860 EDA 2016

                 v.                       :

                                             :    TRIAL COURT
KHAILYL CHAMBERS                  :    NO: 4747-2010

**ROGERS, J.**                                          **JANUARY 17, 2018**

## ***OPINION***

### I. INTRODUCTION

Khailyl Chambers ("Appellant") has appealed to the Superior Court of Pennsylvania ("Superior Court") from the undersigned's December 16, 2016 order denying relief following a protracted hearing, and dismissing his first petition pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. For the reasons that follow, the December 16, 2016 order should be affirmed.

### II. FACTS AND PROCEDURAL HISTORY

The relevant facts and procedural history underlying this appeal as taken from this court's March 19, 2013 opinion on direct appeal are as follows.



On the evening of Friday, June 26, 2009, friends and relatives gathered at the home of Lynette Garnett on Wood Street in Norristown for a birthday party for Lynette's friend, Yolandia Carter. In addition to Ms. Garnett and Ms. Carter, guests at the birthday party included the Decedents, Bruce Palmer and Jackie Scott, Najiyah Simmons and Ruth Walker. Sometime between 11:30 and midnight, the party broke up and several of the party guests decided to go to the Roo House Tavern on Willow Street in Norristown. Najiyah Simmons rode to the Roo House in an Oldsmobile. Lynette Garnett drove Bruce Palmer and Jackie Scott to the tavern in a black Durango. Ms. Garnett parked across the street from the Roo House. Ruth Walker drove a white Ford Explorer over to the tavern and parked behind the black Durango.

When the Roo House closed at 2:00 a.m., the party goers filed out of the tavern and walked toward the white Ford Explorer and the black Durango. Najiyah Simmons and Ruth Walker walked out of the tavern and down the ramp with Bruce Palmer and Jackie Scott. As Mr. Palmer and Ms. Scott crossed the street and neared the black Durango, Appellant approached. First, Appellant shot Jackie Scott twice in the head and then turned his gun on Bruce Palmer, firing multiple times. As Mr. Palmer ducked to avoid the shots, Appellant squatted to continue shooting at Mr. Palmer from under the black Durango. When he had finished firing multiple rounds, Appellant fled the scene running with a taller, lanky young man down Willow Street and into an alleyway.

Norristown Borough Police Department Patrol Officer Michael Bishop responded to the call for shots fired at 1037 Willow Street at approximately 2:05 a.m. on Saturday, June 27, 2009. The Officer found Jackie Scott on the sidewalk on the west side of the street lying in a pool of blood and Bruce Palmer lying in the street under the Durango right in front of Ms. Scott. Medics arrived at the scene and transported the victims to Hahnemann Hospital in Philadelphia, where they both died from their gunshot wounds. C. Chase Blanchard, M.D., an Assistant Medical Examiner for the City of Philadelphia, performed the autopsies of the two victims and ruled each of their deaths a homicide.

The Norristown Police and Montgomery County Detective Bureau conducted a thorough joint investigation starting immediately after the shootings and continuing for the next several months. One witness at the scene, Tionna Scruggs, approached Officer Bishop and provided a description of the shooter as a black male, dressed in all black, short, with a beard. Ms. Scruggs also

2

told Officer Bishop that there was a second male there, taller, dressed in all black and she saw both males running down Willow Street to Scott Alley. Other witnesses also described the two men they saw run from the scene. They described the shooter as a short, husky or stocky, young black man wearing dark clothing, a black baseball-type cap and holding a black gun in his right hand. Some of the witnesses thought they saw facial hair but stated that they did not get a good look at the shooter's face. They described the second man who ran with the shooter as taller, light-skinned, wearing a white t-shirt and no cap.

Lieutenant Richard Nilsen served as the lead investigator for the Montgomery County Detective Bureau on the case. Detective Albert Dinnell collected twelve (12) spent 9-millimeter shell casings and numerous bullet fragments from the crime scene. On June 29, 2009, Lieutenant Nilsen interviewed Charles West, a potential witness the police had identified off of surveillance video from the Roo House. At that time, Mr. West gave a statement in which he described the two individuals he saw running down the same side of the street after the shooting. Mr. West described one of the individuals as "short, dark skinned. He was young. He was about 19 or 20." Mr. West went on to state that he could not see the young man's face because he was wearing a black fitted hat that had the visor bent down. After watching portions of a surveillance video, Mr. West picked out someone he thought was the taller, light-skinned young man that he had described in his statement. Police later identified that individual as Anthony Lochetto.

On March 2, 2010, Lieutenant Nilsen interviewed Mr. West at Mr. West's home to ask some follow up questions. Lieutenant Nilsen showed Mr. West two photo arrays from which Mr. West picked out the photos of Appellant and Anthony Lochetto and identified them as the men he saw with the people that were shot and then running away right after the shooting. Mr. West explained that he had seen the two men outside the tavern before the shooting happened. As Mr. West described it, "[t]hey were floating out there pretty much the whole night."

On July 16, 2009, police officers picked up Anthony Lochetto off the street and took him to the police station to question him about the murders. Mr. Lochetto admitted that he was on Willow Street in the area of the Roo House early Saturday morning, June 27, 2009, and gave a description matching Appellant but did not provide Appellant's name. Officers arrested Mr. Lochetto on May 12, 2010, for unsworn falsification regarding his July 16, 2009

3

statement. Mr. Lochetto subsequently provided Appellant's name as the shooter and additional details surrounding the murders.

Detectives obtained a warrant to arrest Appellant for the premeditated murders of Bruce Palmer and Jackie Scott on May 19, 2010. On September 23, 2010, Appellant filed an Omnibus Pre-Trial Motion, which included a Motion to Suppress Identification. Appellant challenged the eyewitness identification by Charles West after Mr. West had viewed portions of a surveillance video and then picked out Appellant from a photographic array months later. The undersigned conducted a suppression hearing on December 2, 2010. The court subsequently denied Appellant's Motion to Suppress Identification by order docketed on March 18, 2011.[1]

On September 20, 2011, Appellant waived a jury trial, electing to proceed before the undersigned without a jury. Appellant's nonjury trial commenced on Monday, October 3, 2011, and concluded on Friday, October 7, 2011. The Commonwealth presented the testimony of several eyewitnesses, including the friends and relatives who had attended the birthday party before going to the Roo House, as well as others who were present at the scene of the shooting, including Anthony Lochetto. In addition, the Commonwealth presented the testimony of Kutesha Bey, Nigeria King and Malik Mack.

Mr. Lochetto ("Ant") testified that he and Appellant were in the area of the Roo House Tavern Friday evening into Saturday morning selling drugs with another friend, Charles Hernandez ("Chum"). Chum went into the tavern a few times but Ant and Appellant stayed outside. As people were leaving the Roo House, Ant and another woman engaged in conversation on the sidewalk across the street from the tavern. As the two conversed, Ant heard gunshots. Ant looked over to see Appellant on the same sidewalk shooting twice, pausing and then continuing to shoot. Ant watched as Appellant squatted down and kept shooting in the direction of the black Durango. When Appellant finished firing the gun, he called "Ant, come on" and the two ran off. (*Id.* at 44). Eventually they split up and Anthony Lochetto went home.

---

[1] On March 18, 2011, the undersigned issued Findings of Fact and Conclusions of Law Pursuant to Rule 581(I) of the Pennsylvania Rules of Criminal Procedure along with its order denying Appellant's Motion to Suppress Identification.

4

Later in the day, Lochetto went with Appellant to a house in Norristown belonging to a mutual friend, Kutesha Bey ("Butter"). (*Id.* at 55-56). Appellant told Butter that he had shot the woman and bragged about getting the man after the guy had ducked to get under a car. (*Id.* at 64). Appellant explained to Butter that Chum had gotten into his head and that is why he shot the couple.

Kutesha Bey explained to the court that she had walked in on a conversation in her backyard between Appellant and Ant the afternoon of June 27, 2009. Ms. Bey testified that Anthony was very upset and Appellant admitted that he had shot two people. Appellant told Butter that it had been a "favor for a favor", and that Chum had "put his head to him."

Malik Mack testified that he saw Appellant, Chum and Butter a few days after the murders. On this occasion, Appellant tried to sell a 9-millimeter semiautomatic handgun to Mr. Mack for about $600.00. Appellant told Mr. Mack that the gun "had two bodies on it."[2] Appellant explained to Mr. Mack that Chum had told Appellant who the target was and that the girl "was at the wrong place at the wrong time."

Finally, the Commonwealth presented a stipulation concerning testimony from Detective John Finor, who is an expert in the field of firearms and tool marks. Detective Finor performed an analysis of the twelve (12) spent 9-millimeter shell casings recovered from the crime scene and determined that all twelve were fired from the same semiautomatic handgun. The Detective also performed an analysis of all of the recovered projectiles and projectile fragments, and while seven (7) of them were not suitable for comparison, he concluded that twelve (12) of them were all fired from the same gun. Detective Finor also examined a Times Herald photograph published on June 25, 2009, depicting Appellant in the left foreground and what the Detective believed to be the butt and magazine floorplate of a pistol protruding out of Appellant's waistband.

Following a review of the evidence and testimony as well as the applicable law, this court found Appellant guilty of the aforementioned offenses on October 7, 2011. The undersigned

---

[2] Nigeria King, another good friend of Appellant, testified that she had seen Appellant with a semiautomatic handgun in June of 2009, and that she knew Appellant had tried to sell a handgun to Mr. Mack after the murders.

deferred sentencing and ordered a presentence investigation report. The court sentenced Appellant on December 12, 2011. In total, Appellant received two life sentences plus a consecutive three and one-half (3 1/2) to seven (7) years of incarceration. Appellant filed post-sentence motions seeking a judgment of acquittal, or in the alternative, a new trial, on December 20, 2011. The undersigned denied Appellant's post-sentence motions on December 27, 2011.

Appellant timely filed a notice of appeal to the Superior Court of Pennsylvania ("Superior Court") on January 5, 2012. On the same day, this court directed Appellant to file a Concise Statement of the Errors Complained of on Appeal ("Statement") pursuant to Pa.R.A.P. 1925(b). Appellant filed his Statement on January 11, 2012.

(Trial Court Opinion, No. 186 EDA 2012, filed March 19, 2013, at 2-9) (citations to the record omitted). William R. McElroy, Esquire represented Appellant pretrial, at trial, at sentencing and on appeal. The court also appointed Paul Bauer, Esquire as death penalty counsel.

The Superior Court issued a memorandum opinion affirming the judgment of sentence on October 18, 2013. *Commonwealth v. Chambers*, No. 186 EDA 2012 (Pa.Super. Oct. 18, 2013) (unpublished memorandum). On April 2, 2014, the Pennsylvania Supreme Court denied Appellant's petition for allowance of appeal. Appellant timely filed his first *pro se* PCRA petition by placing it in the prison mail on March 10, 2015,[3] which the Clerk of Courts docketed on March 24, 2015. On April 3, 2015, the undersigned appointed Benjamin Cooper, Esquire ("Attorney Cooper") to represent Appellant and

---

[3] Under the "prisoner mailbox rule", a *pro se* document is considered filed on the date it is placed in the hands of prison authorities for mailing. *Commonwealth v. Crawford*, 17 A.3d 1279, 1281 (Pa.Super. 2011) (citation omitted).

6

granted counsel sixty (60) days to review the record. On May 19, 2015, Appellant filed an amended PCRA petition attaching a purported certification for witness Charles Hernandez ("Hernandez" or "Chum"). On June 1, 2015, the court granted counsel's request for an additional ninety (90) days to review the record and confer with Appellant. On August 21, 2015, the undersigned granted counsel's request for an additional sixty (60) days to review the record and amend the petition.

Appellant filed a *pro se* motion to waive counsel and proceed *pro se* on August 24, 2015. The court scheduled a *Grazier*[4] hearing for September 9, 2015, by order docketed on August 28, 2015. On September 2, 2015, Appellant filed a motion to withdraw his motion to proceed *pro se*, which the Clerk of Courts docketed on September 10, 2015. On November 20, 2015, Attorney Cooper filed a Supplement to the petition for collateral relief, which the Commonwealth answered and moved to dismiss on December 4, 2015.

On February 5, 2016, Attorney Cooper filed a motion to amend petition for collateral relief averring, *inter alia*, that Appellant was prejudiced when the undersigned heard a motion *in limine* and thereafter proceeded to preside over the trial and that the court should recuse itself from any further proceedings. The undersigned heard argument on Appellant's motion on February 24, 2016, and denied the motion to recuse by order entered on February 29, 2016.

---

[4] *Commonwealth v. Grazier*, 552 Pa. 9, 713 A.2d 81 (1998).

7

Appellant filed another motion to amend petition for collateral relief on February 22, 2016, to add a claim under *Montgomery v. Louisiana*.[5] The Commonwealth filed its answer and motion to dismiss the motion to amend on March 8, 2016. On April 7, 2016, this court entered two orders granting Appellant's motion for leave to amend and scheduling a PCRA evidentiary hearing for Wednesday, May 4, 2016.

At the May 4, 2016 hearing, Appellant and his trial attorneys, Attorney McElroy and Attorney Bauer, testified. Appellant testified that he told Attorney McElroy that Hernandez could dispel Anthony Lochetto's testimony at trial that Hernandez had in some way "hired" Appellant to kill the victims. (N.T. PCRA Hearing, 5/4/16, at 6-7). Appellant also testified that Attorney McElroy told Appellant that he was not going to call Hernandez, "it was not a good idea" and "it doesn't make sense to call him" but did not explain his reasoning. (*Id.* at 5, 7, 8). According to Appellant, these conversations about strategy occurred pretrial in the visiting room at the Montgomery County Correctional Facility. (*Id.* at 8).

Attorney McElroy testified that Appellant had given him a letter written by Hernandez early on, that he knew Hernandez had been charged with solicitation to commit murder in this case and that after Appellant's trial, Hernandez pled guilty to a possession offense but not to the solicitation charge. (*Id.* at 44, 45, 47). Attorney McElroy also testified that he learned through

---

[5] __ U.S. __, 136 S.Ct. 718, 193 L.Ed.2d 599 (2016).

8

discovery the Commonwealth's theory of the case was that Hernandez had put Appellant up to committing the murder as a *quid pro quo* for a favor that was going to be done for Appellant in Harrisburg. (*Id.* at 49-50). Counsel understood that Montgomery County Detectives had developed information that Hernandez had been beaten up by the victim at a halfway house in the recent past. (*Id.*). Attorney McElroy believed that he had asked the investigator to interview Hernandez but did not have a specific recollection of doing so. (*Id.* at 47).

Attorney McElroy explained that although he believed Appellant wanted Hernandez to be a witness, and that they would have had discussions about it, Attorney McElroy could not see any positive to calling Hernandez. (*Id.* at 56). He testified that Hernandez could not offer Appellant an alibi, and the Commonwealth had videotape of Appellant at the Roo House at the time of the murders, as well as an eyewitness to the shooting in Anthony Lochetto. (*Id.* at 57). Additionally, their mutual friend Kutesha Bey told police that Appellant had made admissions after the fact. (*Id.*). Attorney McElroy saw no benefit to calling Hernandez as a witness when he wanted to keep any evidence of motive out of the case. (*Id.*).

At the continuation of the PCRA Hearing on Monday, June 13, 2016, Attorney McElroy provided additional insight into his trial strategy.[6] Attorney

---

[6] Attorney McElroy has been practicing law for more than twenty (20) years, first as a prosecutor and then as a private attorney. (N.T. PCRA Hearing, 6/13/16, at 33). At the time of Appellant's trial in 2011, Attorney McElroy's practice consisted of approximately ninety-nine percent (99%) criminal defense work and he had handled approximately seven (7) or eight (8)

9

McElroy testified that the defense theory was misidentification and that Appellant did not commit the crime. (N.T. PCRA Hearing, 6/13/16, at 16). Counsel explained that he had subpoenaed three (3) witnesses who testified at trial that somebody else with a Muslim beard was the shooter. (*Id.*) It was Attorney McElroy's goal to keep out the Commonwealth's evidence through witnesses who would testify that the victim had repeatedly beaten up Hernandez months earlier, thus providing a motive for Hernandez to solicit Appellant to commit the murder, and that he was successful in doing so. (*Id.* at 64-75). Attorney McElroy also knew Hernandez had an open charge to solicitation to commit this murder, so he opined that Hernandez would not have anything relevant or beneficial to offer the defense at trial. (*Id.* at 64).

Attorney McElroy was asked about an undated, typewritten letter by Hernandez to him as well as an August 15, 2010, handwritten letter from Appellant to him marked and admitted as Exhibit P-3. (*Id.* at 13). Of note, in the Hernandez letter to Attorney McElroy, Hernandez tells Appellant's Counsel "I have no personal knowledge of the incident". (*Id.* at 75-76). Further, Hernandez writes, "having no personal knowledge of the incident, I cannot see how I can in any way add to the defense of [Appellant's] case." (*Id.*; Exhibit P-3, Hernandez letter). In Appellant's August 15, 2010 letter to Attorney McElroy, Appellant wrote "on behalf of a friend", Hernandez, who was brought to MCCF

---

murder cases. (*Id.* at 33-34). After the court appointed Attorney McElroy to defend Appellant, he hired an investigator, met with Appellant at MCCF approximately twelve (12) times and spent well in excess of one hundred (100) hours reviewing discovery. (*Id.* at 34, 36)

10

and questioned about Appellant's case. According to Appellant, "[Hernandez] was found to have no knowledge of the case. However his transfer papers stated he was brought here as a witness to the defense. Me and you both no [sic] that is untrue". (*Id.* at 76, Exhibit P-3, Appellant's letter to Attorney McElroy). In addition, Attorney McElroy confirmed that he had received and read the grand jury testimony given by Hernandez on November 17, 2010. (*Id.* at 18; Exhibit P-5, Grand Jury testimony of Charles Hernandez, 11/17/10).

Before that grand jury panel, Hernandez testified that he arrived at the Roo House on June 26, 2009, sometime around 11 p.m. and was in and out of the bar until closing. (N.T. Grand Jury, 11/17/10 at 40, 45, 54). Hernandez explained that he was "fully intoxicated that night". (*Id.* at 24). He testified that he saw Appellant outside of the bar a few times that evening (*Id.* at 54), but did not see Appellant at closing time. (*Id.* at 60). After closing time, Hernandez testified that he was outside sitting two or three doors down from the bar when he heard shots ring out. (*Id.* at 61). He did not see who was involved in the shooting because of the people and vehicles blocking his view. (*Id.* at 61, 81). After the shots rang out, he ran and later blacked out. (*Id.* at 62, 64).

Attorney McElroy testified that this information only served to confirm his opinion that Hernandez offered nothing that was relevant or that would contribute to Appellant's defense. (N.T. PCRA Hearing, 6/13/16, at 18). Attorney McElroy also testified that he would never call a witness at trial that he had not spoken with previously. (*Id.* at 64).

11

The undersigned presided over the third session of Appellant's PCRA hearing on August 2, 2016, at which Hernandez, John I. McMahon, Jr., Esquire ("Attorney McMahon") and Michael J. Dayoc testified. After waiving his right to remain silent,[7] Hernandez confirmed that he did not see what happened when the two (2) people were killed outside of the Roo House in the early morning hours of June 27, 2009. (N.T. PCRA Hearing, 8/2/16, at 12). Hernandez testified that he had seen and spoken with Appellant earlier in the night, but he did not see who fired the gun and he did not see where Appellant was when the shots were fired. (Id. at 13, 14). His purported contribution to Appellant's defense was that Hernandez would have testified that he did not solicit Appellant to kill one of the victims and that witnesses Anthony Lochetto and Kutesha Bey had changed their statements more than once and were not being truthful. (Id. at 16, 19-20; Exhibit P-9, Letter from Hernandez to Attorney McMahon filed November 3, 2011).[8]

---

[7] Because the Commonwealth had charged Hernandez with perjury, violation of the controlled substance, drug, device and cosmetic act and solicitation to commit murder as a codefendant in this case, and the charges of perjury and solicitation were *nol-prossed*, the court appointed an attorney to represent Hernandez at the hearing. Joseph J. Hylan, Esquire met with Hernandez at MCCF to advise him not to testify and conducted a colloquy to ensure Hernandez understood that the charge of solicitation to commit murder has no statute of limitations. The court also confirmed this understanding. (N.T. PCRA Hearing, 8/2/16, at 7, 9, 11).

[8] The Hernandez letter to Attorney McMahon concerned the case against Hernandez and the alleged perjury regarding his involvement only. (N.T. PCRA Hearing, 8/2/16; Exhibit P-9).

12

Attorney McMahon confirmed that the court appointed him to represent Hernandez in this matter on June 20, 2011, replacing another attorney,[9] and that the charges remained open until well after Appellant's trial in October 2011. (*Id.* at 51, 54-55, 62). Attorney McMahon was able to negotiate a plea deal with the Commonwealth that he opined would not have happened if Hernandez had testified for the defense in Appellant's trial. (*Id.* at 56-57). Had Hernandez sought to testify on behalf of Appellant when he had open charges to solicitation to commit murder in the same case, Attorney McMahon explained that he "would have strongly advised [Hernandez] that that would be absolute insanity and beyond foolish" and "would have emphatically emphasized to him that that would be a terrible, terrible decision for many reasons". (*Id.* at 58-59, 67). Attorney McMahon testified that he had many discussions with Hernandez and was "quite sure" that Hernandez never indicated to him that Hernandez wanted to testify in Appellant's defense. (*Id.* at 60-61, 67-68). Finally, Mr. Dayoc testified that he was the investigator working for Attorney McElroy and Attorney Bauer on Appellant's case, that he had spoken with Attorney McMahon about talking to Hernandez as a potential witness for Appellant's defense, and that Attorney McMahon had denied his request to speak with Hernandez. (*Id.* at 70, 71-72).

---

[9] Appellant was originally represented by the Montgomery County Public Defender's Office until the court appointed Attorney McMahon as conflict counsel on June 20, 2011. (Montgomery County Docket No. 3385-2011).

13

After a thorough review of the record and having presided over three (3) days of PCRA hearing testimony, the court denied Appellant's PCRA petition by order entered on December 16, 2016. The Montgomery County Public Defender's Office filed a notice of appeal on Appellant's behalf on December 19, 2016. This court directed Appellant to file a Concise Statement of the errors complained of on Appeal pursuant to Pa.R.A.P. 1925(b) ("Statement") by order entered on December 23, 2016. On December 28, 2016, the Public Defender's Office filed a "Preliminary Concise Statement and Motion for Leave for Extension of Sixty Days to Review Notes of Testimony and File Final Concise Statement". On January 3, 2017, the court entered an order granting an extension of thirty (30) days to file a supplemental concise statement. On January 25, 2017, the Public Defender's Office requested an additional extension. The Superior Court entered an order on January 26, 2017, denying the Public Defender's motion to withdraw appearance without prejudice to file the motion in this court.

On January 27, 2017, the Public Defender's Office filed a concise statement, and on January 31, 2017, a motion to withdraw appearance of the Office of the Public Defender and appoint conflict counsel. This court granted the motion to withdraw on February 6, 2017, and appointed Henry S. Hilles, III, Esquire on February 7, 2017. On February 28, 2017, Attorney Hilles requested an extension to file a concise statement, which this court granted by order entered on March 3, 2017. Appellant filed his concise statement on March 30, 2017.

14

## III. ISSUES

Appellant has raised the following issues in his concise statement:

1. The United States Supreme Court has held that a sentence of mandatory life imprisonment without parole for juvenile offenders violates the Eighth Amendment of the United States Constitution (*Miller v. Alabama*, 567 U.S. 460 (2012)) and that this is to be applied retroactively (*Montgomery v. Louisiana*, 136 S.Ct. 718 (2016)). The Honorable Court erred in failing to re-sentence [Appellant] on theories that (i) [Appellant] was only 10 days past his 18th birthday on the date that the instant offenses occurred and (ii) [Appellant] may properly be considered a juvenile for the purposes of the instant sentence of mandatory life imprisonment because, under the Pennsylvania Juvenile Act, [Appellant] could have been supervised as a juvenile until he was 21 years of age (42 Pa.C.S. § 6302 *et seq.*).

2. [Trial] Counsel was ineffective for failing to interview Charles Hernandez (who was originally charged with Criminal Solicitation to commit the instant homicides), and/or otherwise investigate whether Charles Hernandez could provide exculpatory evidence at trial (particularly in light of the evidence introduced at the PCRA hearing that Mr. Hernandez had written trial counsel a letter essentially offering to testify on [Appellant]'s behalf at trial).

3. [Trial] Counsel was ineffective for failing to call Charles Hernandez (who was originally charged with Criminal Solicitation to commit the instant homicides) to testify at trial (particularly in light of the evidence introduced at the PCRA hearing that Mr. Hernandez had written trial counsel [a letter] essentially offering to testify on [Appellant]'s behalf at trial).

(Appellant's concise statement, filed March 30, 2017).

## IV. DISCUSSION

In *Commonwealth v. Baumhammers*, the Pennsylvania Supreme Court reiterated the applicable, well-settled law as follows:

> To be eligible for relief, a PCRA petitioner must establish by a preponderance of the evidence that his conviction or sentence

15

resulted from one or more of the circumstances enumerated in Section 9543(a)(2) of the PCRA, and that the allegation of error has not been previously litigated or waived. *See, e.g., Commonwealth v. Sneed*, 616 Pa. 1, 16-17 & n. 13, 45 A.3d 1096, 1105 & n. 13 (2012). For present purposes, the circumstances that would warrant relief are a constitutional violation, or ineffective assistance of counsel, which so undermined the reliability of the truth determining process that no reliable adjudication of guilt or innocence could have taken place.

625 Pa. 354, 364, 92 A.3d 708, 714 (2014).

As it pertains to Appellant's claim of ineffective assistance of counsel, the

Pennsylvania Supreme Court has repeatedly stated:

a PCRA petitioner will be granted relief only when he proves, by a preponderance of the evidence, that his conviction or sentence resulted from the "[i]neffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). "Counsel is presumed effective, and to rebut that presumption, the PCRA petitioner must demonstrate that counsel's performance was deficient and that such deficiency prejudiced him." *Colavita*, 606 Pa. at 21, 993 A.2d at 886 (citing *Strickland, supra*). In Pennsylvania, we have refined the *Strickland* performance and prejudice test into a three-part inquiry. *See Pierce, supra*.[10] Thus, to prove counsel ineffective, the petitioner must show that: (1) his underlying claim is of arguable merit; (2) counsel had no reasonable basis for his action or inaction; and (3) the petitioner suffered actual prejudice as a result. *Commonwealth v. Ali*, 608 Pa. 71, 86, 10 A.3d 282, 291 (2010). "If a petitioner fails to prove any of these prongs, his claim fails." *Commonwealth v. Simpson*, — Pa. —, 66 A.3d 253, 260 (2013) (citation omitted). Generally, counsel's assistance is deemed constitutionally effective if he chose a particular course of conduct that had some reasonable basis designed to effectuate his client's interests. *See Ali, supra*. Where matters of strategy and tactics are concerned, "[a] finding that a chosen strategy lacked a reasonable basis is not warranted unless it can be concluded that an alternative not chosen offered a potential for success substantially greater than the course actually

---

[10] *Commonwealth v. Pierce*, 515 Pa. 153, 527 A.2d 973 (1987).

16

pursued." *Colavita*, 606 Pa. at 21, 993 A.2d at 887 (quotation and quotation marks omitted). To demonstrate prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Commonwealth v. King*, 618 Pa. 405, 57 A.3d 607, 613 (2012) (quotation, quotation marks, and citation omitted). " '[A] reasonable probability is a probability that is sufficient to undermine confidence in the outcome of the proceeding.' " *Ali*, 608 Pa. at 86–87, 10 A.3d at 291 (quoting *Commonwealth v. Collins*, 598 Pa. 397, 957 A.2d 237, 244 (2008) (citing *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052)).

*Commonwealth v. Spotz*, 624 Pa. 4, 33-34, 84 A.3d 294, 311-12 (2014). *Accord Baumhammers, supra* at 372, 92 A.3d at 719.

Appellate review of an order denying PCRA relief is limited to examining whether the record supports the PCRA court's findings of fact and whether the court's conclusions of law are free from legal error. *Spotz, supra* at 32, 84 A.3d at 311 (citation omitted); *Commonwealth v. Busanet*, 618 Pa. 1, 17, 54 A.3d 35, 45 (2012) (citation omitted); *Commonwealth v. Furgess*, 149 A.3d 90, 93 (Pa.Super. 2016) (citation omitted). The scope of review is limited to the PCRA court's findings and the evidence of record, viewed in the light most favorable to the prevailing party in the PCRA court proceedings. *Spotz, supra; Busanet, supra.* These findings are viewed with great deference and will not be disturbed "merely because the record could support a contrary holding." *Commonwealth v. Touw*, 781 A.2d 1250, 1252 (Pa.Super. 2001) (citation omitted). Where the PCRA court has heard the witnesses' testimony and observed their demeanor, it is in the best position to determine whether that testimony was credible. *Baumhammers, supra* at 369, 92 A.3d at 717 (citing *Commonwealth v. Weiss*, 565 Pa. 504, 518, 776 A.2d 958, 966 (2001)). The

17

PCRA court's determination is "to be accorded great deference," and is binding on the Superior Court if supported by the record. *Id.* (citations omitted).

In Appellant's first issue on appeal, he contends that this court erred in declining to re-sentence him, pursuant to the holding in *Miller v. Alabama*,[11] for two reasons:  1) Appellant was only ten (10) days over the age of eighteen (18) on the day of the two (2) homicides[12] and 2) Appellant may properly be considered a juvenile because he could have been supervised as a juvenile until he turned twenty-one (21) years of age under the Pennsylvania Juvenile Act. Appellant is mistaken.

Preliminarily, as the Pennsylvania Supreme Court noted in *Commonwealth v. Batts,* __ Pa. __, __, 163 A.3d 410, 418 (2017), a charge of homicide mandates removal of a matter from the jurisdiction of the juvenile court and requires the case to be filed in adult criminal court. *See* 42 Pa.C.S. § 6302 (excepting murder from the definition of a delinquent act).  Accordingly, this court rejects the second prong of Appellant's argument out of hand.

In *Miller*, given retroactive effect in *Montgomery*, the United States Supreme Court held "mandatory life without parole for those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition on 'cruel and unusual punishments.' " 567 U.S. at 465, 132 S.Ct. at 2460, 183

---

[11]  567 U.S. 460, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012).

[12]  Appellant stipulated at trial that his date of birth is June 14, 1991, making him eighteen (18) years and thirteen (13) days old on the day of the murders, June 27, 2009. *See* Trial Court Opinion (No. 186 EDA 2012), filed March 19, 2013, at 14 n.8.

18

L.Ed.2d at __. However, Pennsylvania courts have not extended the holding in *Miller* to individuals who have reached the age of eighteen (18). *Furgess*, 149 A.3d at 94 (reinforcing the holding of *Commonwealth v. Cintora*, 69 A.3d 759, 764 (Pa.Super. 2013)). While the issue on appeal in *Furgess* and *Cintora* was whether the constitutional right announced in *Miller* constituted an exception to the time bar for a facially untimely PCRA petition, the Superior Court concluded in both cases that it did not because all of the petitioners were over eighteen (18) years of age. In *Commonwealth v. Woods*, __ A.3d __, 2017 WL 2536525 (Pa.Super. June 12, 2017), the appellant was eighteen (18) years and thirty-six (36) days old when he committed the murder for which he received a life sentence. The *Woods* Court reasoned "while the Supreme Court's holding in *Miller* set forth a bright-line rule that mandatory sentences of life imprisonment without the possibility of parole are unconstitutional for juvenile offenders, it did not prevent a trial court from imposing a life sentence upon an individual such as Appellant who was over the age of eighteen at the time he committed the offense." *Woods, supra* at *6.[13] Accordingly, Appellant's reliance on *Miller* for relief is unavailing.

In his second and third issues on appeal, Appellant asserts that Attorney McElroy provided ineffective assistance of counsel by failing to interview

---

[13] *Accord Commonwealth v. Cox*, 2017 WL 393425 (Pa.Super. Jan. 30, 2017) (unpublished judgment order) (holding appellant not entitled to relief under *Montgomery/Miller* because he was eighteen years old at the time of the offense and no longer a juvenile); *Commonwealth v. Kightlinger*, 2016 WL 7321773 (Pa.Super. Dec. 16, 2016) (unpublished judgment order) (same).

19

Charles Hernandez and by failing to subsequently call Henandez as a witness to testify on Appellant's behalf at trial. These claims also merit no relief.

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements of the *Strickland* test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial. *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 536 (2009); *Commonwealth v. Clark*, 599 Pa. 204, 961 A.2d 80, 90 (2008). To demonstrate *Strickland* prejudice, a petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case." *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1134 (2008). Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense. *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1319 (1996). "A failure to call a witness is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy." *Id.*

*Sneed*, 616 Pa. at 22-23, 45 A.3d at 1108-09.

Moreover,

> [a] PCRA petitioner cannot succeed on a claim that counsel was ineffective for failing to call a witness if the witness's testimony would not have materially aided him. In such a case, the underlying-merit and prejudice prongs of the *Pierce* test logically overlap. To show prejudice, the petitioner must demonstrate that there is a reasonable probability that, but for counsel's allegedly unprofessional conduct, the result of the proceedings would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Baumhammers, supra* at 382-83, 92 A.3d at 725 (citing *Gibson, supra*).

Instantly, Appellant fails more than one prong of the *Strickland* test.

First, Appellant has not demonstrated that Hernandez was either available or

20

willing to testify for him at trial. Specifically, Michael J. Dayoc testified that he inquired and was denied access to Hernandez by Attorney McMahon. While neither Attorney McElroy nor Attorney McMahon could specifically recall whether an effort was made to speak with Hernandez by Appellant's defense team, Mr. Dayoc was unequivocal and credible in his testimony. Attorney McMahon also testified that he was quite sure Hernandez, his client, never told him that Hernandez wanted to testify for Appellant's defense and that, if Hernandez had said he wanted to testify, Attorney McMahon would have strongly advised against it given the open charge for solicitation of murder and the ongoing negotiations on Hernandez's behalf.

Additionally, Appellant produced three letters written by Hernandez. In the first letter sent in August of 2010, Hernandez wrote that he had no personal knowledge of the incident and could not add to Appellant's defense. The second letter Hernandez purportedly wrote in November 2010, before he was charged, stated that he was never part of any conversation with Appellant concerning the shooting. Finally, Hernandez filed a third letter in November 2011, a month after Appellant's trial, regarding his own case and claiming that both Lochetto and Bey had committed perjury. The undersigned found Hernandez's testimony and evidence to be self serving and portions thereof inherently incredible.

Second, Appellant has not established how Hernandez's testimony would have been helpful and that the absence thereof was so prejudicial as to have denied Appellant a fair trial. Hernandez readily admitted that he did not see

21

who shot the two victims, and he did not see Appellant at the time of the murders. Hernandez's self-serving testimony that he did not solicit Appellant to murder the victims may have rebutted the Commonwealth's theory of motive but did not address whether or not Appellant committed the crimes, was not exculpatory for Appellant, and would not have materially aided Appellant's defense. Indeed, Attorney McElroy's trial strategy to keep out evidence of motive would have been severely compromised had Hernandez testified. Attorney McElroy had a reasonable basis and sound trial strategy for not calling Hernandez because of the Commonwealth's theory of the case and the evidence to support that theory.

Appellant has also failed to demonstrate that Attorney McElroy's strategy lacked a reasonable basis because calling Hernandez as a defense witness allegedly offered a potential for success substantially greater than the course Counsel actually pursued. Appellant has not shown that there is a reasonable probability that, had Attorney McElroy called Hernandez as a defense witness at trial, the result of the proceedings would have been different. To the contrary, had Hernandez actually decided to testify at Appellant's trial despite Attorney McMahon's stern warnings and advice, the Commonwealth was prepared to present witnesses tying Hernandez to one of the victims and thereby provide a motive for the murders.

The evidence against Appellant presented at trial including, but not limited to, the testimony of Mr. Lochetto, Ms. Bey, and Mr. Mack, was substantial. Because Attorney McElroy had a reasonable basis for keeping

22

evidence of motive out of the case, and was successful in doing so, Appellant cannot reasonably claim to have been prejudiced by Counsel's decision not to call Hernandez at trial. Accordingly, Counsel cannot be deemed ineffective.

## V. CONCLUSION

Based upon the foregoing analysis, this court respectfully requests that the December 16, 2016 order denying relief and dismissing Appellant's PCRA Petition be affirmed.

**BY THE COURT:**

**THOMAS P. ROGERS, J.**
**Court Of Common Pleas**
**Montgomery County, Pennsylvania**
**38th Judicial District**

Copies sent on 1/17/18 to:
**By Interoffice Mail:**
Deputy District Attorney Robert M. Falin, Chief of Appeals Division,
    Office of the Montgomery County District Attorney

**By First-Class Mail:**
Henry S. Hilles, III, Esquire, Counsel for Appellant

Khailyl Chambers, KH-3040
SCI Coal Township
1 Kelley Drive
Coal Township, PA 17866-1020

Judicial Secretary

23